684 F.2d 648
 95 Lab.Cas. P 13,774, 3 Employee Benefits Ca 2155
 Madge H. ELSER and Margaret E. Thomas, individually and on
behalf of all others similarly situated,
Plaintiffs-Appellees and Cross-Appellants,
v.
I. A. M. NATIONAL PENSION FUND, Defendant-Appellant and
Cross-Appellee.
 Nos. 80-6095, 81-5024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 10, 1982.
Decided Aug. 20, 1982.
 
 1
 Robert M. Simpson, Rose, Klein & Marias, Los Angeles, Cal., for defendant-appellant and cross-appellee.
 
 
 2
 Robert D. Vogel, Pappy, Kaplon & Vogel, Los Angeles, Cal., for plaintiffs-appellees and cross-appellant.
 
 
 3
 Appeal and Cross-Appeal from the United States District Court for the Central District of California.
 
 
 4
 Before HAYNSWORTH* and CHOY, Circuit Judges and JAMESON,** District Judge.
 
 JAMESON, Senior District Judge:
 
 5
 Defendant-appellant, I. A. M. National Pension Fund, has appealed from a judgment holding that the Fund's cancellation provisions are arbitrary and capricious and that plaintiffs-appellees, Madge H. Elser and Margaret C. Thomas, and others similarly situated, were improperly denied pensions.
 
 I. Factual Background
 
 6
 The Fund operates a multiemployer pension plan structured in accordance with the requirements of Section 302(c)(5) of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5), and as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(37). The plan was created in 1960 by the International Association of Machinists and Aerospace Workers (I.A.M.) and several employers of I.A.M. represented employees. The plan is administered by trustees designated by the international union and participating employers. Each participating employer and local union has agreed to comply with terms established in their collective bargaining agreements and in the trust agreement under which the plan was created and operates.
 
 
 7
 The plan provides that employees must have at least ten years of "credited service" to qualify for pension benefits. "Credited service" is comprised of both "past service credit" (i.e. credit for periods of eligible employment prior to an employer's initial contribution) and "future service credit" (credit for periods of covered employment for which contributions were actually made).[1] Although the pension "vests" when an employee accumulates ten years of credited service, pension payments do not begin until the employee attains age fifty.
 
 
 8
 Waste King, former employer of Elser and Thomas, began contributing to the pension plan on January 1, 1969, pursuant to its 1968 collective bargaining agreement with I.A.M. District Lodge No. 94. In December of 1974, approximately fifty of Waste King's employees met to consider decertifying the I.A.M. union. The collective bargaining agreement between Waste King and the union expired January 31, 1975, at which time Waste King ceased contributing to the plan. On February 26, 1975, the employees met again to consider decertification. Two days later the union lost a decertification election.
 
 
 9
 Elser and Thomas were both employed by Waste King for at least ten consecutive years. As a result of Waste King's withdrawal from the plan on January 31, 1975, both appellees had only six years of future service credit. The remainder of their ten years service was past service credit.
 
 
 10
 When Waste King withdrew from the Fund in 1975, Article IX, Section 4 of the plan provided for retroactive cancellation of all past service credit should an employer cease making contributions to the Fund and remain in business. Excluded from this cancellation were those employees who were already receiving pensions or who had left their employment more than 24 months before or within 30 days after their employer's termination of participation. The plan also allowed the reinstatement of past service credit if the covered employee earned at least five more years of future service credit within eight years of his employer's termination of participation.[2] The Fund had attempted to give employees notice of these provisions through pension booklets, union meetings and the I.A.M. newspaper.[3]
 
 
 11
 On June 3, 1975, the Fund notified Waste King and the union by letter that pursuant to Article IX, Section 4, all past service credit accumulated by plan participants who had not left the employment of Waste King over 24 months before or 30 days after January 31, 1975 had been cancelled. This letter, which was not mailed to the plan participants, did not mention that past service credit could be restored by accumulating five additional years of future service credit within eight years or indicate that minimum service requirements could be met by obtaining future service credit from a different contributing employer. No plan participant avoided the forfeiture of past service credit by leaving the employment of Waste King during the 30 day grace period provided by the Fund.[4]
 
 
 12
 Thomas terminated her employment with Waste King in August 1975 and applied for a pension shortly thereafter. As a result of the cancellation of her past service credit she did not have ten years credited service and her application was denied. Elser terminated employment in October 1977 and was subsequently denied a pension for the same reason.
 
 II. Proceedings in District Court
 
 13
 In June, 1978 Elser and Thomas brought this action for injunctive and declaratory relief pursuant to § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5) and § 404(a)(1) of the ERISA, 29 U.S.C. § 1104(a)(1). They sought, inter alia, a judgment declaring that the cancellation of past service credit was unlawful, and therefore null and void, and "establishing plaintiffs' and the class they represent, eligibility for a pension under the Plan and stating the number of years of credited service to which said employees are entitled." The Fund's answer denied that the cancellation was unlawful and alleged that the plaintiffs were barred by waiver and estoppel, because they had voluntarily decertified the union with full knowledge of the consequences to their pension plan eligibility.
 
 
 14
 The case was submitted on stipulated facts. In a memorandum decision entered on September 5, 1980 the court found that the cancellation provisions were "arbitrary and capricious on their face and as applied to plaintiffs," and, as such, violative of both the LMRA and the ERISA. With respect to Thomas, the court found, as an alternative ground for relief that Thomas had not received adequate notice of the operation of the cancellation provisions. The court rejected the Fund's estoppel defense, since the plaintiffs "did not voluntarily decertify the union."[5]
 
 
 15
 On October 29, 1980, the court certified the proposed class of approximately 75 plaintiffs in two subclasses. Subclass No. 1 includes nonretired employees who left Waste King employment before January 31, 1975 (the termination date of Waste King's contributions), but within 24 months before decertification and withdrawal. Subclass No. 2 includes persons employed by Waste King at the time of decertification and withdrawal. All members of the subclasses had at least ten years of continuous employment with Waste King.
 
 
 16
 In Findings of Fact and Conclusions of Law filed November 26, 1980, the court enjoined the Fund from removing past service credit in calculating plaintiffs' pension eligibility, and awarded retroactive pension benefits, interest, costs and attorney fees. A formal judgment was entered "in accordance with the Findings of Fact and Conclusions of Law". The Fund appealed from the judgment entered in favor of the plaintiff. Elser cross-appealed from the finding of adequate notice.
 
 III. Issues on Appeal
 
 17
 The issues presented on appeal are (1) whether the plaintiffs waived their claim to past service credit through decertification of the union; (2) whether the Fund's rules for cancelling past service credit were arbitrary and capricious under LMRA § 302 (29 U.S.C. § 186) and ERISA § 404 (29 U.S.C. § 1104); and (3) whether the Fund gave the plaintiffs adequate notice of the cancellation provisions.
 
 IV. Jurisdiction
 
 18
 Section 302 of the LMRA, 29 U.S.C. § 186, makes it "unlawful for any employer or association of employers" to pay any money or other thing of value to employee representatives. Section 302(c)(5) creates an exception for employee pension funds, stating that the provisions of Section 302 are not applicable
 
 
 19
 with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)....
 
 
 20
 29 U.S.C. § 186(c)(5) (emphasis added). Section 302(e), 29 U.S.C. § 186(e), provides that federal district courts have jurisdiction "to restrain violations of this section."
 
 
 21
 This court has consistently recognized that § 302(e) "grants district courts jurisdiction to determine whether the provisions of a given retirement fund constitute a structural defect in violation of § 302(c)(5)," but does not "confer general power to interfere with provisions of agreements freely entered into between unions and employers which regulate day-to-day administrative matters of pension coverage and eligibility." Burroughs v. Board of Trustees & Pension Trust, etc., 542 F.2d 1128, 1130 (9 Cir. 1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). See also Alvares v. Erickson, 514 F.2d 156, 165 (9 Cir.) cert. denied, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975); Wilson v. Board of Trustees, etc., 564 F.2d 1299, 1300 (9 Cir. 1977); Ponce v. Construction Laborers Pension Trust, 628 F.2d 537, 541 (9 Cir. 1980). A "structural" defect is present when "pension trustees, acting under the authority of the trust fund 'arbitrarily and capriciously' den(y) pensions to employees." Ponce, 628 F.2d at 541. "Such arbitrary and capricious conduct is deemed not to be 'for the sole and exclusive benefit of the employees,' and is therefore structurally deficient." Id. at 541-42. See also Tomlin v. Board of Trustees, 586 F.2d 148, 149 (9 Cir. 1978); Burroughs, 542 F.2d at 1131.
 
 
 22
 In the recent case of United Mine Workers, etc. v. Robinson, --- U.S. ----, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), the Supreme Court made it clear that the "sole and exclusive benefit" provision of § 302(c)(5) embodies no "reasonableness requirement" and that its "plain meaning is simply that employer contributions to employee benefit trust funds must accrue to the benefit of employees and their families and dependents, to the exclusion of all others." Id. at 1231.[6]
 
 
 23
 Robinson involved a collective bargaining agreement where the eligibility requirements and benefit levels were fixed by the agreement. The Court recognized a distinction between Robinson and those cases in which the eligibility rules and benefit levels are fixed by trustees of the fund. The Court said in part:
 
 
 24
 The Court of Appeals has held in those cases "that the Trustees have 'full authority ... with respect to questions of coverage and eligibility' and that the court's role is limited to ascertaining whether the Trustees' broad discretion has been abused by the adoption of arbitrary or capricious standards." Pete v. United Mine Workers of American Welfare & Retirement Fund of 1950, 517 F.2d 1275, 1283 (CADC 1975) (en banc). Noting that "(t)he institutional arrangements creating this Fund and specifying the purposes to which it is to be devoted are cast expressly in fiduciary form," the court stated that "the Trustees, like all fiduciaries, are subject to judicial correction in a proper case upon a showing that they have acted arbitrarily or capriciously towards one of the persons to whom their trust obligations run." Kosty v. Lewis, 319 F.2d 744, 747 (CADC 1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414.
 
 
 25
 Id. at 1233.
 
 
 26
 Concluding that these cases provided no support for the Court of Appeals' holding that eligibility rules fixed by a collective bargaining agreement must meet a reasonableness standard, the Court noted that
 
 
 27
 In NLRB v. Amax Coal Co., 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672, the Court held that in enacting § 302(c)(5) "Congress intended to impose on trustees traditional fiduciary duties." The Court did not decide, nor do we decide today, whether federal courts sitting as courts of equity are authorized to enforce those duties. It is, of course, clear that compliance with the specific standards of § 302(c)(5) in the administration of welfare funds is enforceable in federal district courts under § 302(e) of the LMRA. See Arroyo v. United States, 359 U.S. 419, 426-427, 79 S.Ct. 864, 868-869, 3 L.Ed.2d 915.
 
 
 28
 Id. at 1233, n.12.
 
 
 29
 This court need not decide whether federal courts are authorized to enforce the fiduciary duties imposed on trustees by § 302(c)(5). The Robinson Court held that the "substantive terms of jointly administered employee benefit plans must comply with the detailed and comprehensive terms of the ERISA." Id. at 1234. "ERISA essentially codified the strict fiduciary standards that a § 302(c)(5) trustee must meet." N.L.R.B. v. Amax Coal Co., 453 U.S. 322, 332, 101 S.Ct. 2789, 2795, 69 L.Ed.2d 672 (1981). The fiduciary duties provisions of the ERISA, § 404, 29 U.S.C. § 1104,[7] became effective January 1, 1975, 29 U.S.C. § 1114(a), and are applicable to the trustees' actions in this case. This court therefore has jurisdiction pursuant to 29 U.S.C. § 1132(f).
 
 V. Standard of Review
 
 30
 The trustees of a pension plan "have broad discretion in setting eligibility rules. A court should interfere only when the rule is unreasonable or its enforcement arbitrary." Giler v. Board of Trustees, 509 F.2d 848, 849 (9 Cir. 1975); Sailer v. Retirement Fund Trust, 599 F.2d 913, 914 (9 Cir. 1979). Because of the trustees' presumed expertise and familiarity with the fund, "(i)t is for the trustees, not judges, to choose between various reasonable alternatives." Ponce, 628 F.2d at 542, quoting from Roark v. Lewis, 401 F.2d 425, 429 (D.C.Cir.1968). See also Tomlin, 586 F.2d at 151; Wilson, 564 F.2d at 1302.
 
 
 31
 The actions of trustees are subject to the same standard of review under the ERISA's fiduciary provisions as they are under the LMRA. Gordon v. ILWU-PMA Benefit Funds, 616 F.2d 433, 438 (9 Cir. 1980).[8] Therefore the decisions of the trustees "may be reversed only where they are arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law." Rehmar v. Smith, 555 F.2d 1362, 1371 (9 Cir. 1976).[9] See also Aitken v. IP & GCU-Employer Retirement Fund, 604 F.2d 1261, 1264 (9 Cir. 1979).[10]
 
 VI. Waiver by Decertification
 
 32
 In contending that appellees' claims should be barred "by the doctrines of waiver and estoppel," appellant argues that since the appellees "voluntarily"[11] chose to decertify the union, which led to a cancellation of past service credit, they "should not be heard to argue now" that the cancellation of past service credit was "arbitrary and capricious". In contending that the decertification election was an "involuntary" forfeiture of past service credit, appellees point out that the members of subclass No. 1 did not even vote in the decertification election and that subclass No. 2 constituted "but a small fraction" of those who actually voted because all members of the bargaining unit were eligible to vote. The appellees argue, therefore, that their vote was outweighed by that of the nonplaintiff employees who did not stand to lose a vested pension right by voting against the union.
 
 
 33
 In response the Fund argues that although subclass No. 1 members did not vote, they "should be deemed to have participated in the overall process of decertification, and to have contributed to its result by terminating their employment within the 24 month period preceding the vote, thereby weakening the anti-decertification constituency." As to subclass No. 2, the Fund argues that if the class members were truly members of a "dissenting minority" who were unwilling to give up their pension benefits, they could have exercised their option to terminate employment within 30 days of Waste King's withdrawal from the Fund.
 
 
 34
 We agree with the district court that the Fund's argument is "unconvincing". There is of course no evidence as to how the class members and other employees voted. The decertification election can hardly be considered a "voluntary" forfeiture of benefits when those who stand to lose the most from decertification are but a small segment of a larger group voting on decertification. The Fund argues that this case is "substantially equivalent" to Giler, supra. Giler, however, involved a "break-in-service" provision, and "Giler voluntarily left covered employment." We find Giler and the other cases cited by appellant distinguishable.
 
 
 35
 The district court properly found that members of subclass No. 1 simply did not vote in the decertification election, and that members of subclass No. 2 "did not voluntarily decertify the Machinists Unions."[12] We agree with the district court that appellees' claims are not barred by waiver or estoppel.
 
 
 36
 VII. Were Cancellation Provisions Arbitrary and Capricious?
 
 
 37
 A. Findings and Conclusions of District Court
 
 
 38
 In both its memorandum decision and subsequent findings of fact and conclusions of law the district court concluded that the cancellation provisions were arbitrary and capricious for several reasons. First, the court noted that "Plaintiffs' forfeiture stands in marked contrast to those persons who left Waste King's employment between January 31, 1970 and January 31, 1973, prior to the 24-month period." The employees in the latter group did not forfeit past service credit even if they had only one year of future service credit and nine years of past service credit. In contrast, members of the plaintiff class, who had up to six years of future service credit, lost all past service credit. Consequently, the court found that "These provisions cancelling past service credit for plaintiffs and not employees who left employment at least two years earlier are arbitrary and capricious on their face and as applied to plaintiffs."
 
 
 39
 Second, the district court concluded that "the application of the cancellation and relief provisions caused a sizeable exclusion of employees from pension benefits without a reasonable justification for this exclusion." Although the court recognized that "actuary insolvency is a critical determination", it concluded "that there were better ways the Fund could have accomplished this ... if indeed the Fund was faced with an unfunded liability resulting from Waste King's termination of participation in the Fund."
 
 
 40
 Finally, the court found that "The trustees of the fund violated (ERISA) Section 404(a)(1) because they treated plaintiffs disparately from other employees by canceling their past service credit." Although the court concluded that the ERISA, 29 U.S.C. § 1002(37), specifically permitted a multiemployer plan to provide for cancellation of past service credit, the court determined that this could not "validate provisions that are otherwise objectionable because they are discriminatorily applied."
 
 
 41
 B. Application of Arbitrary and Capricious Standard
 
 
 42
 At the outset, we recognize that "(t)he pension is not a defined contribution plan (in which each participant's entitlement is a function of his contribution) but a defined benefit plan for which 'there is no precise "fit" between any individual employee's contribution history and that employee's entitlement to benefits.' " Central Tool Co. v. International Ass'n of Machinists National Pension Fund, 523 F.Supp. 812, 817 (D.D.C.1981). The court's affirmative participation should be limited to "those cases where the eligibility requirements are so patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in governing case or statute law." Roark, 401 F.2d at 429. And, the courts will substitute their judgments for the judgments of the trustees, "only if the actions of the trustees are not grounded on any reasonable basis." Ponce, 628 F.2d at 542.
 
 
 43
 After recognizing the limits of the court's participation in evaluating eligibility requirements of a pension plan, the court in Roark continued:
 
 
 44
 We do say that when such employees are denied pensions by a requirement which would give pensions to employees having worked a substantially lesser period of time for contributing employers, the burden is on the trustees to show some rational nexus between the Fund's purpose and the requirement.
 
 401 F.2d at 429.[13]
 
 45
 The appellees have been similarly denied pensions by a requirement which would give pensions to employees having worked a substantially lesser period of time for a contributing employer. The district court examined the effect of the cancellation provisions on various groups of employees. Specifically, the court compared the effect of the rule on the class of plaintiff-appellees to the effect of the rule on those employees who left Waste King employment more than twenty-four months before January 31, 1975. An employee who left Waste King employment more than twenty-four months before that date did not forfeit past service credit, even if that employee had only one year of future service and nine years of past service. On the other hand, members of the plaintiff class who had up to six years of employment while Waste King was making payments into the fund, lost all past service credit. Appellees actually worked for a contributing employer for as many as six years and received no benefits, while others who may have worked only one year for a contributing employer could receive benefits (upon reaching age 50) simply because they left the employer more than two years before the union decertification.
 
 
 46
 "(T)he primary purpose of section 302(c)(5) is to insure that pension benefits are awarded to 'as many intended employees as is economically possible'." Ponce, 628 F.2d at 543, quoting from Gaydosh v. Lewis, 410 F.2d 262, 266 (D.C.Cir.1969). See also § 404(a)(1) of the ERISA, note 7, supra. The Fund urges the court to focus on the fundamental goal of the Fund trustees: "to protect the Fund, that is, the participants and their employers, who have made and are keeping their long-term commitments to contribute to the Fund, against the financial damage which invariably and inevitably results from terminations of employer participation." We find that the purpose of the Fund is to provide benefits to as many intended employees as is economically possible while protecting the financial stability of the Fund.
 
 
 47
 The trustees argue that the cancellation provisions are necessary and reasonable to preserve the financial stability of the Fund. The Fund cannot support an "unfunded liability" to pay pension benefits when the employer's "stream of contributions" terminates. Thus the cancellation provisions are reasonably designed to encourage continued participation in the Fund, and, in the event of withdrawal from the Fund, to protect the Fund from accumulation of "unfunded liability."
 
 
 48
 Appellees concede that the cancellation provisions, if shown to be necessary to preserve the financial integrity of the Fund, would be valid. They agree also that the Fund is correct in contending that the fiscal integrity of the plan depends upon continuing contributions from the employer to pay not only for the current service credit but also to amortize the liability for past service credit. But, although the Fund's concerns are "legitimate in the abstract," appellees argue that "they have no basis in fact because the Fund did nothing to determine if those concerns (about financial integrity) existed when it cancelled the past service credit of Elser and Thomas and the class they represent."
 
 
 49
 It is true, as appellees contend, that the Fund offered no evidence to show that the failure to cancel past service credit would result in an unfunded liability that would affect the actuarial soundness of the plan. It was stipulated that "The Fund has never calculated the total unfunded liability for Waste King as of January 31, 1975."[14] There was, in other words, no evidence to show whether or not Waste King's four to six years of contributions on behalf of the plaintiffs would be sufficient to provide for the plaintiffs' pension payment without threatening the financial stability of the Fund.
 
 
 50
 In Central Tool, supra, the plaintiff[15] argued, as here, that the cancellation of forfeiture provisions were arbitrary and capricious because they discriminated among participants and because they were not actuarily justified. In a careful analysis of the I.A.M. pension plan, the court noted that "It is the purpose of the forfeiture provision to protect the fund from the dumping of unfunded liability as a result of an employer's termination of participation after past service credits have been granted to its employees." Recognizing that "the goal itself is unexceptionable" and that "(a) forfeiture provision may be reasonable if it is actuarily necessary," the court found that the Trustees of the Fund had "not offered any actuarial evidence to support their claim that the provision is tailored to the need to protect the fund." 523 F.Supp. at 816.
 
 
 51
 The court concluded in Central Tool that the forfeiture provisions "must be reasonably tailored overall to meet their objectives, that is, there must be a rational relationship between the means and the objective ... and that the forfeiture provisions may not impose a penalty of greater scale than would be necessary to protect the fund from the dumping of unfunded liability." Id. at 817. The court concluded further that in light of the availability of less drastic means to accomplish the objectives of fund preservation[16] the challenged provisions were arbitrary and capricious on their face and hence constituted a structural violation of section 302 of the LMRA.[17]
 
 
 52
 We agree with the holdings in Roark and Central Tool and conclude that under the circumstances of this case the Fund had the burden of showing some rational nexus between the Fund's purpose and the forfeiture provisions. There is, of course, no question that preservation of the financial integrity of the Fund is a central concern of the trustees. Robinson, --- U.S. ----, 102 S.Ct. 1226, 71 L.Ed.2d 419. This is clearly recognized in Roark and Central Tool. But here, as in Central Tool, appellant has submitted no actuarial evidence to support its contention that the forfeiture provisions are necessary or reasonable to protect the financial stability of the fund.[18]
 
 VII. Conclusion
 
 53
 We conclude that (1) the district court's holding that the plaintiffs-appellees did not waive claims to past service credit by the decertification of the union is correct; and (2) the cancellation provisions depriving the appellees of past service credit are arbitrary and capricious, and have a structural defect in violation of § 302 of the LMRA and § 404 of the ERISA, by reason of appellant's failure to meet its burden of showing a reasonable relationship between the cancellation provisions and the purpose of the fund, i.e., that the provisions were necessary to preserve the financial soundness of the Fund.[19] The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Clement F. Haynsworth, Jr., Senior Circuit Judge, United States Court of Appeals, Fourth Circuit, sitting by designation
 
 
 **
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 The crediting of past service is common in multiemployer plans. This feature allows employees who are near retirement age when their employer first contributes to the plan to be eligible for benefits calculated on the basis of all their years of employment, after as little as one year's contributions have been made
 
 
 [2]
 These provisions were included in an amendment to the plan in 1973. The cancellation provisions had undergone several revisions since Waste King joined in the plan in 1969. Originally the plan excluded from cancellation only those plan participants who were already receiving pensions and those who had left their employment more than 24 months prior to their employer's termination of participation
 In December of 1974, the Fund restored its former practice of cancelling only past credited service by repealing the 1973 amendment which required cancellation of future credited service upon an employer's termination of participation.
 
 
 [3]
 In 1970, the Fund sent copies of its pension booklet, which contained the rules and regulations of the plan, to I.A.M. District Lodge No. 94, which in turn delivered them to Waste King's payroll office for distribution to the company's covered employees. In July, 1974, the Fund sent to each contributing employer, I.A.M. union office and each covered employee at his home address the 1974 revised edition of the pension booklet. Neither Elser nor Thomas recall receiving the booklet. In January, 1975, the I.A.M. newspaper printed a special report on the I.A.M. National Pension Fund which specifically referred to the Article IX cancellation provisions. The newspaper was mailed to all union members at their last known address
 The subject of pension forfeiture was discussed at two meetings conducted by the local I.A.M. union called for the purpose of discussing the upcoming decertification election. The union's notes of the first meeting, held on December 9, 1974, indicate that in discussing the subject of pension eligibility, the union "(b)rought up the fact that on the pension, if the decert (author's emphasis) did go through, the employees would be considered short term employees and would stand to lose all pension benefits." (Emphasis added.) Elser is shown on the union's roster as attending the meeting, but she does not recall being present. Thomas did not attend. Although the pension plan was discussed a second time at a February 26, 1975 union meeting, the record does not reflect whether any of the appellees attended or to what extent the cancellation provisions were discussed.
 
 
 [4]
 At least nine persons who retired from Waste King before January 31, 1975 (and whose 10 years' service was necessarily based in part on past credit) continued to receive pension payments
 
 
 [5]
 Following the June 3, 1975 letter from the Fund to Waste King the successor union had filed unfair labor practice charges, which were denied by the Regional Director, and the dismissal was affirmed by the General Counsel. Again in 1978, after denial of Elser's individual pension applications, the successor union filed another unfair labor practice charge. The Regional Director refused to issue a complaint, and the General Counsel affirmed. In its memorandum decision the court concluded that the NLRB proceedings were irrelevant since the issues in those proceedings were different from those addressed in this action
 
 
 [6]
 In Robinson, the Court of Appeals for the District of Columbia Circuit had invalidated the provisions of a collective bargaining agreement allocating health benefits among potential beneficiaries of an employee benefit trust fund. In reversing, the Supreme Court held that pension fund trustees are obligated to enforce the eligibility requirements fixed by the collective bargaining agreement unless modification is required to comply with applicable federal law. Id. at 1233
 
 
 [7]
 § 404(a)(1) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan...."
 
 
 [8]
 See also Fentron Industries v. Nat. Shopmen Pension Fund, 674 F.2d 1300 (9 Cir. 1982). As the court noted in Gordon, 616 F.2d at 437, and Fentron Industries, 674 F.2d at 1307, Congress designed ERISA to promote pension plans and to protect their beneficiaries
 
 
 [9]
 Rehmar adopted the standard of review established in Danti v. Lewis, 312 F.2d 345, 348 (D.C.Cir.1962), and Kosty, 319 F.2d at 747, which was referred to in Robinson
 
 
 [10]
 This court has also recognized a related standard for determining whether a pension plan is structurally deficient, i.e., the "sizeable exclusion/reasonable justification" standard. See Burroughs v. Board of Trustees of Pension Trust, etc., supra; Souza v. Trustees of Western Conference, 460 F.Supp. 483 (N.D.Cal.1978)
 
 
 [11]
 The fund bases its argument on the voluntary/involuntary test applied to the "break-in-service" eligibility rules considered in Lee v. Nesbitt, 453 F.2d 1309 (9 Cir. 1972); Giler, 509 F.2d at 849; and Wilson, 564 F.2d at 1301
 
 
 [12]
 In its memorandum decision, the district court relied on Lee v. Nesbitt, supra, in applying the voluntary/involuntary test
 
 
 [13]
 Roark was an action by retired coal miners against trustees seeking, inter alia, damages and an order compelling their enrollment as beneficiaries of a trust fund and also seeking injunctive relief. The district court had granted the miners' motion for summary judgment. The court of appeals held that the pension applicants had made a prima facie case of unreasonableness in the requirement that the applicant's last regular employment must have been with a contributing operator, but remanded for a hearing at which the trustees would be allowed to show what, if any, reasonable relationship existed between the purpose of the trust and the requirement
 
 
 [14]
 It was stipulated further that the contributions made by Waste King to the Fund from 1969 to 1975 totaled $433,728.00, and that as of January 31, 1975, there were "approximately 66 individuals employed in a bargaining unit capacity for 10 or more continuous years." Appellees argue that the contributions, "a substantial portion of which was contributed on behalf of non-class members who did not possess vested pension rights, succeeded in financially backing the past service credit which was arbitrarily rescinded by the Fund."
 
 
 [15]
 In Central Tool, the cancellation provisions were challenged by an employer, whose employees were former participants in the pension fund. The Fund had cancelled past service credits for all employees who did not fit into any of the excepted categories. The employer had agreed at the time of termination to establish its own pension fund for the benefit of its employees and to pay the benefits that would have been paid under the defendants' plan
 
 
 [16]
 In concluding that "far less punitive means than forfeiture" were available to accomplish the legitimate objectives of fund preservation, the court said: "For example, the plan agreement itself contains a separate provision, not challenged here, to remedy the problem of employers terminating from the plan within the first four years of plan participation. The agreement provides that, in the event of such a termination, pension benefits shall only be reduced to the extent necessary to prevent the dumping of unfunded liability (calculated on the basis of a comparison of contributions and actuarially anticipated benefits payments). Defendant has proffered no explanation for the failure of the plan agreement to apply such an actuarially-based mechanism to protect the fund from unfunded liability with regard to the employee groups here involved." 523 F.Supp. at 818
 
 
 [17]
 See also Winpisinger v. Aurora Corp. of Ill., etc., 456 F.Supp. 559 (N.D.Ohio, 1978), where the court considered in detail the I.A.M. pension fund and held invalid a portion of the plan insofar as it applied retroactively to cancel past service credit of two special classes. The court concluded that "if the Trustees choose to 'protect the fund' through a forfeiture of past service credits, the forfeiture must fall evenly on all participants in the Fund. To do otherwise would violate section 1104(a)(1) by virtue of not being an action of the Trustees that is 'solely in the interests of the participants and beneficiaries.' " Id. at 573
 
 
 [18]
 We recognize that there is language in Wilson v. Board of Trustees, supra, which tends to support the Trustee's contention that they were not required to show that the forfeiture provisions were necessary to protect the financial soundness of the fund. Wilson, however, is distinguishable in part by reason of the court's finding that Wilson's break in employment was "voluntary". The court in Wilson concluded: "Rules in many settings frequently overreach in order to secure their objectives with certainty. This does not in all circumstances make them unreasonable or arbitrary. One must weigh the extent of the overreaching against the importance of certainty. We have done this and find the overreaching, if such it be, in this case tolerable and neither unreasonable nor arbitrary." 564 F.2d at 1302
 
 
 [19]
 Having reached this conclusion, it is unnecessary to consider further the "sizeable exclusion/reasonable justification" standard or the adequacy of the notice to plaintiffs