**Joseph L. BLACKWELL, Plaintiff,**

**v.**

**TRANSAMERICA OCCIDENTAL LIFE, et al., Defendants.**

**TRUSTEES OF THE TEAMSTERS SECURITY FUND FOR SOUTHERN NEVADA, Plaintiffs,**

**v.**

**Leanard SAYE, and Central Administrators, Inc., a Nevada corporation, Defendants.**

Nos. CV-S-84-218-LDG, CV-S-84-246-LDG.

United States District Court, D. Nevada.

Aug. 31, 1987.

On Damages, Attorneys Fees and Prejudgment Interest April 18, 1988.

Andrew S. Brignone, Todd Touton, Lionel, Sawyer & Collins, Las Vegas, Nev., for plaintiff Trustees of the Teamsters Sec. Fund for Southern Nevada.

Victor Miller, Edwards, Hunt & Hale, Las Vegas, Nev., for defendant Transamerica Occidental Life.

James J. Jimmerson, Radford J. Smith, Jimmerson & Davis, Las Vegas, Nev., for defendant Leonard Saye and Cent. Administrators, Inc.

## MEMORANDUM OPINION

GEORGE, District Judge.

This action was brought by the Trustees of the Teamsters Security Fund for Southern Nevada ("Trustees") against Central Administrators, Inc., ("Central") and its owner, Leonard Saye, essentially claiming that Central breached its fiduciary duty in administering portions of the Southern Nevada Teamsters Security Fund in that it (1) failed to maintain eligibility records in a readily transferable form (the "eligibility records claim"), and (2) failed to take adequate steps in verifying the eligibility of a self-paying beneficiary before authorizing coverage and accepting premium payments from him (the "Blackwell claim").[1] The Trustees seek damages and attorneys fees. After hearing the evidence and the argu-

1. On August 8, 1986, the eligibility records case and the Blackwell case were consolidated.

ments of parties, this court is prepared to render its decision.

### Facts

Plaintiffs in this action are the Trustees of the Teamsters Security Fund for Southern Nevada. The Trust is a Taft–Hartley Trust Fund created and governed in part by the Employment Retirement Income Security Act of 1974 ("ERISA"). The Southern Nevada Teamsters Security Fund (the "Fund") is a multi-employer fund in which many different employers contribute on behalf of their various employees. Under such a plan continuous insurance coverage could be provided for an employee who works for many different employers. The Fund also utilizes a system known as an "hours bank" in which an employee could "bank" the hours above his eligibility minimum and use those hours to pay premiums for insurance benefits during temporary periods of unemployment. The Fund also had provisions to allow an employee who meets certain eligibility requirements to "self-pay" the premiums in order to maintain insurance coverage.

In May of 1982, Central became the administrator of the Fund's comprehensive major medical plan. In January of 1983, Central also began administering the dental/vision portion of the plan. The parties negotiated, but never executed a written agreement governing their relationship. However, Saye knew that trust administration frequently changed, and understood that the period of Central's administration of the Fund was indefinite.[2]

The administrator prior to Central used a manual system to keep track of employee eligibility. When Central took over administration it began to computerize administration of the plan. Central's computer used a "hard disk" to store information and did not maintain a manual backup to the computerized eligibility information.

In approximately July of 1983, Central began to implement a dual-input eligibility computer program. Up until that time,

2. In a meeting on September 3, 1982, Saye described the term of the administration arrangement as "month to month."

Central was able to generate a hardcopy printout of the plan's eligibility information. Central encountered problems with the dual-input program, but continued to adjudicate benefit claims individually. As early as October, 1983, Saye assured the Trustees that the new computer system would be operational within a few months.

In October, 1983, Saye became aware that the Trustees were sending the administration of the Fund out to bid.[3] On January 3, 1984, Saye was notified by Richard J. Davis, attorney for the Fund, the that the Trustees had awarded administration of the Fund to Glen Slaughter and Associates ("Glen Slaughter") effective March 1, 1984. On January 10, 1984, Central was notified by hand delivered letter from Andrew S. Brignone, co-counsel for the Fund, that Central's services as administrators of the Fund were terminated effective immediately.

However, because of the delay in computerizing the eligibility information, Central was not able to produce a computer generated eligibility report. In order to adequately administer the plan, and in the absence of an up-to-date eligibility report from Central, Glen Slaughter recreated eligibility information from source documents in its possession at additional expense to the Fund.

Finally, on May 29, 1984, after issuance of a court order, Central provided an "unaudited and incomplete" list of eligibility. Because of its inaccuracies, this list proved completely unusable. Other Fund documents named in the court order were not transferred until July 19, 1983, more than six months after the change of administrations. The Trustees now seek damages and attorneys fees resulting from expenses incurred for Central's failure to maintain and turn over adequate trust records.

In April of 1984, Sherri Blackwell telephoned Central administrators and spoke with Terry Mayberry, a premium clerk. Mrs. Blackwell told Mayberry that her husband, who had previously been insured by the Fund, recently quit his job, and that she was pregnant and wanted to keep her medical insurance. Mayberry advised Mrs. Blackwell that they were eligible to self-pay the insurance premiums to keep the coverage. The Blackwells made three self-payments by check dated May 2, 1983, May 31, 1983, and June 30, 1983.

One of the conditions for self-pay eligibility under the plan is that the insured be on the union out-of-work list. Central relied on information provided by the union business agent to verify the eligibility of self-payors. Mr. Blackwell quit his job in April of 1984, and was eligible for coverage into May 1984. However, because Mr. Blackwell was not on the union out-of-work list in June, he was ineligible for coverage that month and when the claim for his wife's delivery arose. Nonetheless, two more self-payment checks were received from the Blackwells before Central learned from the business agent that Mr. Blackwell was ineligible.

Central then communicated to Blackwells the denial of their claim and refunded the self-payments. As a result of a lawsuit by Blackwells against Central and the Trustees, the Trustees settled with the Blackwells for the amount of their claim. The Trustees now seek indemnification from Central of the amount they paid to settle the Blackwell claim. The Trustees allege that Central mishandled the Blackwell claim by accepting self-payment checks from Blackwells without inquiring as to Mr. Blackwell's eligibility, and for denying the Blackwell claim without advising them of their right to appeal the denial.

---

3. Saye was present at an October 11th meeting when the Trustees resolved to prepare materials to place the contract out for bid. One reason that the Trustees decided to send the Fund administration out to bid was that Transamerica Occidental Life, the Fund's insurer, threatened to drop coverage if Central continued as administrator over the Fund.

Central was allowed to bid on the new contract. The evidence is in dispute as to whether Central's bid was seriously considered, or whether Central was allowed to bid merely out of professional courtesy. In any event, it was clear to Saye that Central might not be awarded the next administration contract.

## Discussion

Section 3(2)(A) of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. section 1002(21)(A) states:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he had any discretionary authority or discretionary responsibility in the administration such plan.

This court holds that Central is a fiduciary under this section. *See Jung v. FMC Corp.*, 755 F.2d 708, 710–11 (9th Cir.1985) (employer-administrator held to be a fiduciary under ERISA).

■ An initial issue is what standard should be used for reviewing Central's alleged breach of fiduciary duties. Defendants argue that the courts have held fiduciaries liable when their actions are found to be "arbitrary and capricious." Plaintiff contends that the "arbitrary and capricious" standard is used only when courts review a fiduciary's denial of a benefit claim, and that defendants should be liable for negligence in administering the trust. This court agrees that defendants' actions in this case should be governed by the express language of the ERISA statute and not by the arbitrary and capricious standard.

Section 404(a)(1) of ERISA, 29 U.S.C. section 1104(a)(1), states:

(a) Prudent man standard of care

(1) Subject to sections 2203(c) and 9(d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ...

The vast majority of cases in which courts have applied the "arbitrary and capricious" standard to judicial review of a fiduciary's actions deals with claim denial reviews. *Struble v. N.J. Brewery Emp. Welfare Trust Fund*, 732 F.2d 325, 333–34 (3rd Cir.1984); *Kaszuk v. Bakery and Confectionary Union*, 638 F.Supp. 365, 371 n. 9 (N.D.Ill.1984), *aff'd*, 791 F.2d 548 (7th Cir.1986). *See, e.g., Jung v. FMC Corp.*, 755 F.2d 708, 711 (9th Cir.1985) (applying arbitrary and capricious standard to employer's denial of benefits to a class); *Elser v. I.A.M. National Pension Fund*, 684 F.2d 648 (9th Cir.1982) (applying the arbitrary and capricious standard in evaluating a trust fund's rules for cancellation of an employee's "past service credits" upon withdrawal), *cert. denied*, 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983); *Fentron Industries v. Nat. Shopmen Pension Fund*, 674 F.2d 1300 (9th Cir.1982) (arbitrary and capricious standard applied to review of denial of benefits).

The *Struble* court recognized a distinction between review of a decision where a fiduciary balances the interests of present claimants against the interests of future claimants, and a review of a decision to advance the interests of nonbeneficiaries. 732 F.2d at 333–34. In the former type of action, the arbitrary and capricious standard would be employed; in the latter, the express standards of ERISA would be applicable. *Id.*

Though the Ninth Circuit has not ruled on which standard would be applied in reviewing fiduciary decisions not involving claim adjudication,[4] this court believes that the express provisions of ERISA should be applied in this case. The lack of adequate record keeping and failure to verify eligibil-

---

4. In *Jung v. FMC Corp.*, 755 F.2d 708 (9th Cir. 1985), the court recognized the distinction made by the *Struble* court, but applied the arbitrary and capricious standard to the situation before them, which involved a fiduciary's denial of benefits to a class of beneficiaries. *Id.* at 711.

ity do not involve the balancing of interests of classes of fund beneficiaries in determining claim eligibility. Indeed, the actions of the administrator in this case are more closely aligned to negligence in fund management decisions advancing the interests of nonbeneficiaries, including themselves, over the interests of all potential beneficiaries of the plan. *See Donovan v. Mazzola,* 716 F.2d 1226, 1233–35 (9th Cir. 1983) (trustees breached duty under ERISA by negligently selecting unqualified consultant), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1983); *Kaszuk v. Bakery and Confectionary Union,* 638 F.Supp. 365, 371 (N.D.Ill.1984) (liability for failure to comply with notice provisions of Fund), *aff'd,* 791 F.2d 548 (7th Cir.1986).

 Having decided that the express language of 29 U.S.C. section 1104 governs Central's actions in this case, the court now considers plaintiff's specific claims of fiduciary breach. Central administered the plan without a written agreement fixing the length of the administration. Nonetheless, Central embarked on a complicated dual-entry computerization venture without maintaining a backup system which would readily retrieve Fund eligibility information. Because of the problems encountered with the dual-entry program, Central was unable to transfer eligibility information at the time of the change in administration, causing delay and necessitating the creation of eligibility information by the new administrator.[5] Furthermore, Central's motives for withholding Fund records were not "solely in the interests of the [Fund's] participants and beneficiaries."[6] This court finds that such actions by Central did not meet the standard of prudence under section 404 of ERISA and were therefore a violation of a fiduciary duty of care.

With respect to the Blackwell matter, this court finds that the actions of Central likewise constituted a breach of fiduciary duty of care. Central was or should have been aware of the self-pay conditions set forth in the Agreement and Declaration of Trust.[7] Furthermore, Saye had been warned that claimants might try to cheat the fund. Central, however, continued to rely for eligibility verification information exclusively on the union business agent, an individual over whom Central had no direct control.[8] As a consequence, Central accepted payments from the Blackwells before it became apprised of the fact that Mr. Blackwell was no longer on the out-of-work list. Therefore, Central acted imprudently in failing to make some further inquiry into the Blackwell's eligibility before accepting his self-payor premiums. This was a

---

**5.** Central has made much of the fact that the Trustees did not allow them at least 90 days to effectuate the transition. Central claims that the precipitous termination of their administration and the subsequent removal of source documents from their possession made it impossible to debug the new computer program and provide eligibility information. However, the evidence indicated that Central had notice as early as October, 1983, of the Trustees' plans to change administrations. Also, Saye had represented to the Trustees that the computer system would be operative by approximately year end 1983. Finally, had Central maintained a backup system for maintaining eligibility information, it could have transferred that information despite the alleged short notice.

**6.** At a meeting with representatives of the Fund at Central's offices on January 20, 1984, Patricia Zubia, Vice President of Central, indicated that Central could not transfer all of the requested trust records because, "We have to cover our butts!".

To the extent that an arbitrary and capricious standard might apply to the review of Central's actions, this court holds that by failing to transfer the requested Fund documents, Central's actions were "totally unreasonable," *Allen v. United Mine Workers of America Ben. Plan,* 726 F.2d 352, 354 (7th Cir.1984), taken in "bad faith," *Jung v. FMC Corp.,* 755 F.2d 708 (9th Cir.1985), and arbitrary and capricious with respect to the eligibility records claim. The Blackwell claim is considered only under the prudent man standard.

**7.** Article IV subsection 4.2 of the Declaration of Trust in Central's possession stated:

(a) Participants who are not working, but available for work and registered with their local union for work, may be allowed to pay their own health and welfare premiums for a maximum of six (6) months, provided they have met their qualification pre-funding period.

**8.** The Teamsters Trust Fund is a distinct legal entity, separate from the union and its employees.

breach of a fiduciary duty of care under ERISA.

The liability for breach of fiduciary duty is set forth in Section 409(a) of ERISA:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach and to restore to such plan any profits of such fiduciary which may have been made through the use of assets of the plan by the fiduciary shall be subject to such other equitable or remedial relief as the court may deem appropriate including removal of such fiduciary....

At the time of trial, argument was heard and evidence presented as to the measure of loss to the Fund as a result of defendants' actions. However, the court would like to hear further argument on the specific measurement of damages in light of this decision. Therefore, IT IS ORDERED that a hearing be scheduled on Sept. 25, 1987, 1:30 P.M., for that purpose.

This opinion is hereby deemed to constitute Findings of Fact and Conclusions of Law.

## ON DAMAGES, ATTORNEYS FEES AND PREJUDGMENT INTEREST

■ On August 31, 1987, this court entered its judgment for plaintiffs in the above-entitled action after a trial before the court. On December 11, 1987, arguments were received on the issue of damages, prejudgment interest and attorneys fees. After further briefings on the issues, the court determines as follows:

### Damages

Plaintiffs should be awarded damages in the amounts of $29,875.00 for the amount paid to Glen Slaughter for reconstruction of trust records; $11,000.00 for the amount paid Layton & Layton for services which would not have occurred but for defendants' actions; and $7,500.00 plaintiffs' settlement payment to the Blackwells.

### Attorneys Fees

Plaintiff's should also be awarded the sum of $51,246.25 as attorneys fees incurred to pursue claims to recover records and associated damages up to the time of trial; and the sum of $13,072.50 for attorneys fees incurred in defending the Blackwell indemnification claim.

After consideration of the factors set forth in *Hummell v. S.E. Rykoff and Co.*, 634 F.2d 446, 453 (9th Cir.1980), the court determines, however, that plaintiffs request for attorneys fees incurred during and after the trial in the amount of $29,-513.75 should be denied. The fiduciary responsibilities of Central Administrators in this case presented a question of first impression. The court does not believe that the costs of resolving the difficult questions of law in this case should rest on defendants.

Moreover, the court found that Central's actions in failing to transfer fund documents were taken in bad faith. However, the degree of Central's bad faith culpability in that matter is fairly reflected in the court's award of attorneys fees incurred in recovering records and associated damages.

### Prejudgment Interest

The court agrees that prejudgment interest calculated at a rate of 7.88 percent compounded annually is justified.

Accordingly, plaintiffs are awarded the total sum of $137,310.77 as damages, attorneys fees and liquidated damages as of December 11, 1987. *See* Plaintiffs' Memorandum in Support of Prejudgment Interest Award, Exhibit 2.