George STEWART, et al.

v.

**NATIONAL SHOPMEN PENSION FUND, et al., Appellants.**

No. 83–1621.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1983.

Decided March 30, 1984.

Thomas J. Hart, Washington, D.C., with whom Lena S. Zezulin, Washington, D.C., was on the brief, for appellants.

Gill Deford, Los Angeles, Cal., with whom Burton D. Fretz, Washington, D.C., was on the brief, for appellees.

Gerald M. Feder and David R. Levin, Washington, D.C., were on the brief for amicus curiae, National Coordinating Committee for Multiemployer Plans, urging reversal.

Before WRIGHT and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

This is a class action, brought on behalf of employees and former employees of Anchor Post Products, Inc. ("Anchor"), against the National Shopmen Pension Fund (the "Fund").[1] The Fund cancelled certain employee service credits of members of the class, which resulted in a reduction of pension benefits to the class members. The district court found that the Fund's actions violated provisions of the Employee Retirement Income Security Act of 1974 (ERISA). *Stewart v. National Shopmen Pension Fund,* 563 F.Supp. 773 (D.D.C.1983). We reverse the district court and remand the decision for consideration of other issues in the case.

## I.

The National Shopmen Pension Fund is a multi-employer pension fund as defined by ERISA §§ 3(2), 3(37)(A).[2] Its board of

---

1. The National Coordinating Committee for Multiemployer Plans, a group of 140 employee pension plans, has filed a brief as *amicus curiae* urging reversal of the district court.

2. 29 U.S.C. §§ 1002(2), (37)(A) (1982). A "multiemployer plan" is one

    (i) to which more than one employer is required to contribute,

    (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

trustees is made up of three representatives of the International Association of Bridge, Structural and Ornamental Iron Workers (the "Union") and three representatives of participating employers. The Fund was in existence prior to the enactment of ERISA, and has been modified to comply with the relevant provisions of that statute. The Internal Revenue Service has certified that the Fund is in compliance with applicable ERISA standards (J.A. 203–05).

Most of the facts are stipulated. In 1969, Anchor entered into a collective bargaining agreement with the Union at Anchor's plant in Baltimore, Maryland. The agreement provided, *inter alia,* that Anchor would begin making pension contributions to the Fund on behalf of its employees, who prior to 1969 had not been enrolled in the Fund.

As was its usual practice, the Fund, in computing pension benefits, granted full credit to all Anchor employees for the years they spent with Anchor prior to enrollment in the pension plan. These pre-enrollment credits are known as "past" or "precontributory" service credits. Service credits earned *after* an employer has begun contributing are known as "future" or "contributory" service credits. Ordinarily, precontributory and contributory service credits are added together to determine the

amount of the individual employee's pension.[3]

Anchor continued to make contributions to the Fund until 1979, when it closed its Baltimore plant. The closing terminated Anchor's obligations under its collective bargaining agreement. Anchor stopped making contributions to the Fund and withdrew from all participation in it. To assess the impact of Anchor's withdrawal, the Fund authorized an actuarial study by the Martin E. Segal Company ("Segal"). The Segal study showed that Anchor had, over the ten-year period, contributed $337,129 to the Fund. Its allocated share of Fund assets at termination was $298,912. The total vested liability of the Fund to Anchor employees was $1,049,181. Thus, the total "unfunded liability"—the amount of pension liability for which no one had paid anything into the Fund—was $750,268, or about 1.8 percent of the total assets of the Fund (J.A. 121,207).[4]

A provision of the Fund's 1976 plan permits the Fund, in cases where unfunded liability is "dumped" into it by an employer, to cancel the precontributory service of present and former employees of that employer. This provision, § 2.09, states:

(a) If an Employer's participation in the Fund with respect to a bargaining unit or group terminates, the Trustees are empowered to cancel any obligation of the Trust Fund that is maintained under the

---

(iii) which satisfies such other requirements as the Secretary [of Labor] may prescribe by regulation.
*Id.* § 1002(37)(A).

**3.** Pensions granted by the Fund are based on two factors: the level of the employer's contribution rate, and the individual employee's total years of service. The Fund provides a schedule by which individual employees can calculate their expected benefits.

**4.** This "unfunded liability" results from the system under which multiemployer pension funds collect contributions and calculate benefits. Typically, when a new employer joins a fund, its employees receive precontributory service credits for the years they spent with the employer prior to joining the fund. For example, a particular employee who had worked for the employer for 20 years before the employer joined the fund would immediately receive 20 years of

service credit. His pension would be based on 20 years of service even though his employer, at the time it joined, had contributed nothing to pay for that pension. This initial liability is totally unfunded. To pay for this unfunded liability, the pension fund collects on a regular basis from the employer an amount in excess of the actual cost of pension coverage for the *contributory service.* This excess amount is used over time to amortize the unfunded liability. The unfunded liability gradually is reduced by the stream of employer payments. This continuing stream is necessary to make the system work; when, as in this case, an employer withdraws after a relatively short time, its payments into the fund have not completely reduced the unfunded liability, and the fund is left with liabilities for which it has received no payments.

Trust Agreement with respect to that part of any pension for which a person was made eligible on the basis of employment in such bargaining unit or group prior to the Contribution Period with respect to that unit or group. Neither shall the Trustees, the Employers who remain as Contributing Employers, nor the Union be obligated to make such payments.

(J.A. 181.)

On the basis of its study, Segal recommended that the Fund use § 2.09 to cancel the precontributory service credits of the Anchor employees. The Segal report concluded that even if all precontributory service were cancelled, the Fund would *still* face an unfunded liability of $154,728, which it would have to absorb (J.A. 207). (As of 1980, the Fund had total assets of $40,700,919 (J.A. 121).) The report's recommendation was unanimously adopted by the trustees in March, 1980 (J.A. 210). All precontributory service of Anchor employees was cancelled for purposes of determining benefits.

George Stewart and Lee Roy Warren are two of the affected Anchor employees. Stewart had been an employee of Anchor since 1940. When Anchor joined the Fund, he was granted 23 years of precontributory service for his work prior to 1969. He continued to work for another 2.7 years after Anchor joined the Fund, and then retired. His initial pension, calculated on 25.7 years of total service, was $80 per month (J.A. 114–18). Warren began working for Anchor in 1959. He had earned 10.6 years of precontributory service prior to 1969. He continued working for Anchor until the Baltimore plant closed in 1979, earning 10.4 years of contributory service. He applied for early retirement when the Anchor plant closed (J.A. 119–20), and his pension, if calculated on his 21 years of total service, would have been $89 per month.

When the Fund cancelled the precontributory service, both Stewart and Warren suffered significant pension cuts. Stewart's pension, now calculated solely on his 2.7 years of contributory service, came to only $9 per month. Warren had his pension cut to $45 per month, calculated solely on his 10.4 years of contributory service.

Stewart and Warren brought this class action, seeking to have the Fund's application of § 2.09 declared invalid and to have their full pension benefits restored. The district court held that the trustees' actions violated ERISA. There are two issues. First, as a threshold matter, is the Fund collaterally estopped from arguing the validity of its actions by the Ninth Circuit's decision in *Fentron Industries v. National Shopmen Pension Fund,* 674 F.2d 1300 (9th Cir.1982)? Second, did the action of the Fund's trustees in cancelling the precontributory service of Anchor employees violate specific procedural requirements of ERISA?

II.

The plaintiffs' collateral estoppel (issue preclusion) claim, which the district court rejected,[5] depends upon the effect of the Ninth Circuit's *Fentron* decision. The plaintiffs argue that the court in *Fentron* passed on the *same* section of the *same* plan, and found it invalid. Hence, they assert, the Fund should be precluded by the *Fentron* adjudication from arguing here that the provision is valid. The plaintiffs were not parties to the *Fentron* decision. They seek to use collateral estoppel offensively under the doctrine of *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979).

Collateral estoppel bars relitigation of issues that were "*actually* and *necessarily* determined by a court of competent jurisdiction." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59

5. The district court found that "a significant factual difference between [this case and *Fentron* ] renders the case at bar sufficiently different to demand individual consideration." The court held that "[t]he issues *Fentron* decided are not ... sufficiently similar to satisfy the requirements of collateral estoppel." 563 F.2d at 776 n. 5.

L.Ed.2d 210 (1979) (emphasis added). The *Restatement* phrases it this way:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, *and the determination is essential to the judgment,* the determination is conclusive . . . .

Restatement (Second) of Judgments § 27 (1982) (emphasis added). The Fund thus is precluded only from litigating issues that were actually and necessarily decided in *Fentron.* The plaintiffs assert flatly that "*Fentron* fully evaluated the identical rule at issue in this case and found it illegal." Brief of Appellee at 36. On the contrary, the *Fentron* court specifically refrained from holding that § 2.09 was "invalid on its face," holding only that § 2.09 *as applied in that case* violated ERISA. 674 F.2d at 1306. We therefore must determine the extent to which the acts of the trustees were held to be violations by the Ninth Circuit.

In *Fentron,* the Fund relied on § 2.09 to cancel precontributory service credits of employees whose employer had effectively withdrawn from the Fund.[6] The Fund cancelled the benefits for purposes of both vesting (*i.e.,* the employee's *right* to receive a pension) and calculation of benefits (*i.e.,* the *amount* of the pension to which the employee has a right). Thus, if an employer in *Fentron* had 20 years of precontributory service, and 9 years of contributory service, he would be denied *any* pension because the Fund requires a minimum of 10 years of service for vesting. *All* of the employees in *Fentron* had less than 10 years of contributory service. 674 F.2d at 1306. The Fund's cancellation of benefits for all purposes thus completely divested employees of their vested right to a pension, and deprived them of pension benefits even for their contributory service.

The Ninth Circuit held that such benefit divestiture, although authorized by the Fund's plan, amounted to a "vesting schedule amendment":

> Before the cancellation of Past Service Credits, the benefits of all members of the class were vested under the 1969 Plan. The effect of cancelling Past Service Credits was to diminish the pension credits of all members, each of whom at that time had to have Past Service Credits to qualify for pension vesting under the 1969 Plan. The cancellation thus divested previously vested employees, who then would only be eligible for vesting in the future, if at all. The trustees' use of section 2.09 was therefore a *vesting schedule amendment* and, in the absence of the option to compute benefits under the 1969 Plan, is prohibited by ERISA § 203(c)(1)(B).

*Id.* (emphasis added). According to the *Fentron* court, the use of § 2.09 to fully divest participants changed their vested status, and hence required the Fund to use a statutory procedure that the trustees had not followed.[7]

■ In the case at bar, the Fund has not attempted to *divest* the plaintiffs completely of their right to a pension.[8] All of the class members will receive pensions, although such pensions will be based solely on the years of contributory service. The issue in this case is whether *accrued benefits* can be reduced, not whether an employee may be completely divested. The distinction is between the *right to receive* a pension and the *amount* of the pension. We do not believe that the *Fentron* case

---

**6.** *Fentron* involved an employer (Fentron) which had joined the Fund in 1971, pursuant to a collective bargaining agreement. When a subsequent collective bargaining agreement expired in 1978, the Fund's trustees refused to take any more contributions from Fentron, and unilaterally cancelled all precontributory service credits of Fentron employees. 674 F.2d at 1302–03. The trustees informed employees that if they left Fentron and joined another employer they would regain all of their lost service credits. *Id.*

at 1303. The employer and the employees together brought suit against the Fund.

**7.** *See* part III *infra.*

**8.** The Fund does not here challenge the result in *Fentron.* Its procedures for cancelling or reducing benefits apparently have been altered to conform to the decision in that case.

reached the question of reduction of benefits.

There is language in *Fentron* which arguably is broad enough to cover the issue in this case.[9] But to the extent that such language goes beyond the issue decided in the case, it will not bar subsequent litigation of related issues. *Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979); *Montana v. United States, supra*, 440 U.S. at 153, 99 S.Ct. at 973. *See Segal v. American Telephone & Telegraph Co.*, 606 F.2d 842, 845 n. 2 (9th Cir.1979) (per curiam) ("relitigation of an issue ... is not foreclosed if the decision of the issue was not necessary to the judgment reached in the prior litigation").

That the *Fentron* holding did *not* cover situations in which only accrued benefits are *reduced* can be seen clearly from the Ninth Circuit's subsequent decision in *Elser v. I.A.M. National Pension Fund*, 684 F.2d 648 (9th Cir.1982), *cert. denied*, ── U.S. ──, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983). *Elser*, which was decided only seven months after *Fentron*, held that a pension fund *could* use a provision substantially similar to § 2.09 to cancel precontributory service for purposes of *reducing* benefits, although the court held that such action could not be taken arbitrarily or capriciously. The *Elser* court cited *Fentron* in passing, but apparently did not consider that it addressed the issue involved in this case since it did not mention *Fentron* in connection with that issue. *Elser*, in fact, cited with approval a district court case from this circuit, *Central Tool Co. v. International Association of Machinists National Pension Fund*, 523 F.Supp. 812 (D.D.C.1981), *appeal docketed*, Nos. 81–2047 & –2056 (D.C.Cir. Sept. 25, 1981), which held that in an appropriate case pension funds *could reduce* benefits by cancelling precontributory service.

In sum, we do not interpret the *Fentron* decision as holding that § 2.09 could never be applied to *reduce* benefits to employees with vested pension rights. The Fund is therefore not collaterally estopped from litigating the validity of the benefit cancellation involved in this case to the extent that they were *reduced*.[10]

---

**9.** *See* note 24 *infra*.

**10.** Even if we were convinced that the *Fentron* decision had reached the issue involved in this case, we would be reluctant to apply collateral estoppel here. Collateral estoppel should not be applied against a party when such application would be unfair. That may be the case as to "unmixed questions of law":

> Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases.

*Montana v. United States*, 440 U.S. 147, 162, 99 S.Ct. 970, 978, 59 L.Ed.2d 210 (1979) (quoting *United States v. Moser*, 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924)). This principle has been incorporated into the *Restatement:*

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
>
> . . . .
>
> (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an inter-

vening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

> . . . .
>
> (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the original action ....

*Restatement (Second) of Judgments* § 28 (1982). As we explained previously, we interpret *Fentron* as consistent with the Ninth Circuit's subsequent decision in *Elser*. If the plaintiffs were correct in their assertions that *Fentron* decided the issue involved in this case, we would be forced to find it clearly in conflict with the subsequent *Elser* decision. If the plaintiffs were correct, then the *Fentron* decision was plainly repudiated by the same court only months later. In that situation, we think that it would be unfair to the Fund to bind it forever to a decision on a question of law that the issuing court rejected only seven months later. This would be especially true in light of the important interests of the employers and employees who are presently members of the Fund, interests which would be affected adversely by reliance on the plaintiffs' interpretation of *Fentron*.

### III.

We come then to the main issue in this case. Does a pension fund have the right under ERISA to use a preexisting plan provision to cancel unilaterally, for purposes of benefit computation, the precontributory service credits of employees whose employer has withdrawn from the fund? The district court relied on two grounds in holding that such cancellation violated ERISA. First, the court held that the resulting change in pension benefits to the affected employees was a "vesting schedule amendment" that did not comply with § 203(c)(1)(B) of ERISA because the employees were not given the chance to have their benefits calculated under the pre-"amendment" formula. Second, the court found that the benefit reduction violated § 204(g) of ERISA because it had not been submitted to the Secretary of Labor for his approval.

### A.

■ ERISA § 203 [11] is the statutory provision that sets forth the minimum vesting

standards that private pension plans must meet. Generally, plans will satisfy § 203 if vested benefits become "nonforfeitable" upon the occurrence of certain conditions spelled out in this section.[12] If benefits are found to be "forfeitable" the pension fund does not comply with ERISA. But there are exceptions to the strict nonforfeitability requirements. Section 203(a)(3) provides that a benefit will not be considered "forfeitable" on the sole ground that it can be divested or reduced in certain specified circumstances. For example, subsection (a)(3)(A) allows a pension fund to terminate benefits on the death of the employee.[13] Subsection (a)(3)(B) permits termination of benefits if the employee who is receiving the pension goes back to work under certain circumstances.[14] Subsection (a)(3)(D) allows benefits to be withheld to the extent that an employee who has contributed his own money to a pension fund withdraws money from his account.[15] Most importantly, for purposes of this case, subsection (a)(3)(E) provides:

> A right to an accrued benefit derived from employer contributions under a

---

**11.** 29 U.S.C. § 1053 (1982).

**12.** Under § 203, a plan meets ERISA's vesting standards if (1) "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age," § 203(a); (2) "an employee's rights in his accrued benefits derived from his own contributions are nonforfeitable," § 203(a)(1); and (3) the employee has worked a certain number of years, § 203(a)(2). There are three alternative vesting schedules that a pension plan may select; any one of the three is lawful. A plan may provide that an employee simply becomes 100% vested after 10 years. ERISA § 203(a)(2)(A). Vesting can occur on a graduated scale, however. A plan can provide that an employee becomes 25% vested after 5 years, with the percentage increasing until the employee is 100% vested after 15 years. § 203(a)(2)(B). Another available scale uses the sum of the years of service and the age of the employee to determine the nonforfeitable amount. § 203(a)(2)(C). The Fund in this case opted to permit 100% vesting of benefits after 10 years, under § 203(a)(2)(A).

**13.** "A right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that it is not payable if the participant dies (except in

the case of a survivor annuity ....)" 29 U.S.C. § 1053(a)(3)(A) (1982).

**14.** A right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that the payment of benefits is suspended for such period as the employee is employed, subsequent to the commencement of payment of such benefits—

. . . . .

(ii) in the case of a multiemployer plan, in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced.

*Id.* § 1053(a)(3)(B).

**15.** A right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that, in the case of a participant who does not have a nonforfeitable right to at least 50 percent of his accrued benefit derived from employer contributions, such accrued benefit may be forfeited on account of the withdrawal by the participant of any amount attributable to the benefit derived from mandatory contributions....

*Id.* § 1053(a)(3)(D)(i). Limitations on this exception are spelled out in the remainder of the subsection.

multiemployer plan shall not be treated as forfeitable solely because the plan provides that benefits accrued as a result of service with the participant's employer before the employer had an obligation to contribute under the plan may not be payable if the employer ceases contributions to the multiemployer plan.[16]

Benefit reductions or cancellations carried out under § 203(a)(3) do not violate ERISA's nonforfeitability requirements. Thus, a provision permitting cancellation of precontributory service credits does not, in itself, violate the vesting requirements of § 203.

The district court, however, did not believe that § 203 created an automatic right to cancel precontributory service credits. In reaching its conclusion, the court relied on two other provisions of ERISA. First, the court examined § 203(c)(1)(B), which provides:

> A plan amendment changing any vesting schedule under the plan shall be treated as not satisfying the requirements of [the vesting provisions] ... unless each participant having not less than 5 years of service is permitted to elect, within a reasonable period after adoption of such amendment, to have his nonforfeitable percentage computed under the plan · without regard to such amendment.[17]

Under this section, when a plan is *amended* to change the *vesting schedule*, employees who have more than 5 years of service must be given a choice: they may choose to have their benefits calculated under the pre-amendment or post-amendment plan formulas.

The district court found that the trustees' action in *cancelling* the service credits was an "amendment" to the plan. The court apparently believed that any reduction in the amount of benefits paid to employees who were vested would be "[a]

plan amendment" to the "vesting schedule":

> A plan's vesting schedule delineates the timetable by which a participant's benefits will become vested i.e. nonforfeitable. The vesting schedule in the National Shopmen Pension Plan provided that benefits were to be nonforfeitable after 10 years of service. The Trustees contend that because they did not officially change this schedule, the action they took pursuant to § 2.09 was not a vesting schedule amendment. However, because *the effect of defendants' actions was to alter the vested benefits of the plaintiffs*, the Court holds that these actions do constitute a change in vesting schedule.

563 F.Supp. at 776 (emphasis added). The court quoted with approval from *Fentron:* "The Fund and its trustees cannot be permitted to do indirectly what would be prohibited if done directly by changing the vesting schedule without changing the vesting provisions of the plan." *Fentron,* 674 F.2d at 1306. The district court held that the change in benefits was an "amendment" to the vesting schedule, and the plaintiffs were entitled to have their benefits computed under the pre-"amendment" plan—*i.e.,* to receive full credit for their precontributory service.

The district court also read the § 203 exemptions in light of another ERISA provision. Section 204(g) provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section [302(c)(8) ]."[18] Application of the "amendment" described in § 302(c)(8) is specifically limited:

> No amendment described in this paragraph which reduces the accrued benefits of any participant shall take effect unless the plan administrator files a notice with the Secretary [of Labor] notifying him of such amendment and the Sec-

---

**16.** *Id.* § 1053(a)(3)(E). Subdivision (E) was a subsequent addition to subsection (a)(3). *See* note 21 *infra.*

**17.** 29 U.S.C. § 1053(c)(1)(B) (1982) (emphasis added).

**18.** *Id.* § 1054(g).

retary has approved such amendment or, within 90 days after the date on which such notice was filed, failed to disapprove such amendment. No amendment described in this subsection shall be approved by the Secretary unless he determines that such amendment is necessary because of a substantial business hardship (as determined under section [303(b)]) and that waiver under section [303(a)] is unavailable or inadequate.[19]

The district court again viewed the benefit reduction resulting from the cancellation of precontributory service credits as an "amendment":

> It is indisputable that the Trustees' action here decreased the accrued benefits of all members of the plaintiff class. Further, the Court holds, pursuant to the same reasoning employed to find an amendment in the vesting schedule, that this reduction in benefits was the result of a plan "amendment."

563 F.Supp. at 777 (footnote omitted). Since the trustees never submitted their "amendment" for approval to the Secretary, the district court held the reduction of credits invalid under § 204(g). Just as in its decision under § 203(c)(1)(B), the district court's decision under § 204(g) depends entirely on its conclusion that any reduction in benefits to pension recipients is a "plan amendment."

The plaintiffs vigorously support this interpretation. They argue that § 203(a)(3)(E) is *not* an unqualified exemption that would allow plan trustees to cancel benefits whenever unfunded liability is present, but rather a *substantive* provision, which may only be carried out through the *procedures* outlined in §§ 203(c)(1)(B) and 204(g):

> That ERISA may permit plans not to count past service credits, and may permit plans to cancel past service credits previously provided, does not answer the question of *how* those cancellations can be effected.... Sections 203(c)(1)(B) and 204(g) speak to that issue, and establish precise guidelines which must be followed when trustees seek to effect certain substantive changes.

Brief of Appellees at 25. The plaintiffs' basic position is that the exemptions listed in § 203(a)(3)—at least, the exemption in subsection (a)(3)(E)—can be exercised *only* if (1) plan participants are given a choice as to whether they are willing to have their benefits cut, *and* (2) the Secretary of Labor determines that such cuts are necessary for the survival of the plan. It is clear that the plaintiffs' interpretation would severely circumscribe the ability of a multiemployer fund to cancel such credits, since it is likely that only the benefits of those employees with less than 5 years of service could *ever* be affected,[20] and then only if necessary to save the Fund from serious financial jeopardy.

For several reasons, we reject the plaintiffs' construction of these provisions.

## B.

We begin by examining the plain language of the provisions in question. Not

---

**19.** *Id.* § 1082(c)(8). In determining whether the fund would face "substantial business hardship," the Secretary may look at whether

    (1) the employer is operating at an economic loss,

    (2) there is substantial unemployment or underemployment in the trade or business and in the industry concerned,

    (3) the sales and profits of the industry concerned are depressed or declining, and

    (4) it is reasonable to expect that the plan will be continued only if the waiver is granted.

ERISA § 303(b), 29 U.S.C. § 1083(b) (1982). Under this section, the Secretary can grant permission to amend the benefit amounts only if it is shown that the amendment is necessary to preserve the fund, *and* if a simple waiver of ERISA's minimum funding standards, ERISA § 302, 29 U.S.C. § 1082 (1982), would not solve the fund's problems.

**20.** While employees under these circumstances *might* (at least conceivably) choose to receive benefits based on the post-"amendment" plan, it is difficult to imagine that rational employees would voluntarily give up their precontributory service credits and accept lower benefits. It seems safe to say that affected employees with 5 or more years of service would almost invariably choose to keep their precontributory service credits, and that hence only the most minor benefit reductions could ever be made, regardless of the necessity involved.

infrequently, the best guide to what a statute *means* is what it *says*. The plaintiffs' construction of §§ 203(c)(1)(B) and 204(g) does violence to the plain language of both sections. Section 203(c)(1)(B) applies only to "plan amendment[s] changing any vesting schedule"; § 204(g) applies only to "amendment[s] of the plan." In both sections, the word "amendment" is used as a word of limitation. Congress did *not* state that any change would trigger the two provisions; it stated that any change *by amendment* would do so. The district court found, and the plaintiffs admit, that there was no "amendment" to the plan in the "technical" sense—*i.e.*, an actual change in the provisions of the plan. True. All that happened was that § 2.09, a provision already incorporated into the plan, was *applied*. Actions authorized by the plan were carried out by the persons authorized to do so.

The plaintiffs' construction would stretch the term "amendment" nearly to the breaking point. Under their construction, reducing *any* benefits, authorized by the plan, of persons whose rights are vested, would constitute an "amendment." While speculation regarding why Congress chooses specific language is not always fruitful, it should be noted that had Congress *meant* either subsection to apply to "any *reduction* in benefits to vested participants," it could easily have said so. The phrases it

chose, "[a] plan amendment" which "decrease[s]" benefits or "change[es] any vesting schedule," are curious ways of saying "any reduction in benefits." A resort to the legislative history does not help the plaintiffs' argument. Nothing in the history lends any credence to the construction they advocate; what history there is, though not particularly helpful, is consistent with the clear language of the subsection.[21]

But we do not simply rely on the plain language of particular subsections in interpreting this statute. As the Supreme Court has noted, ERISA is a "comprehensive and reticulated statute," *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), and each interrelated provision must be read in conjunction with other provisions to determine its meaning. It is important to read each section of this complex statute in its proper context. Analyzing §§ 203(c)(1)(B) and 204(g) in light of the remainder of ERISA also indicates that the construction of the two sections advocated by the plaintiffs is incorrect.

■ To begin with, the plaintiffs fail to distinguish between the concepts of "vested rights" and "accrued benefits," a distinction drawn by Congress in writing the statute. The two principles are related, but different. An employee is "vested" in a ·portion of his benefit when he has a

---

**21.** Subsection (a)(3)(E) was added to the remainder of (a)(3) in the 1980 ERISA Amendments. *See* 94 Stat. 1208, 1292 (1980). The various legislative materials relating to the Amendments discuss § 203(a)(3)(E). The Report of the House Education and Labor Committee on the 1980 ERISA Amendments stated that "a multiemployer plan may, upon withdrawal of an employer, eliminate benefits granted for service before the employer joined the plan." H.R.Rep. No. 869, 96th Cong., 2d Sess. 115 (1980), U.S.Code Cong. & Admin.News 1980, 2918, 2983. At the same time that ERISA was amended, the Internal Revenue Code was amended to conform it to the changes in ERISA. The language of 26 U.S.C. § 411(a)(3)(E) (1982), which is identical to ERISA § 203(a)(3)(E), was discussed in the Report of the House Ways and Means Committee:

Under the bill, a multiemployer plan does not fail to meet the vesting requirements of

ERISA merely because the plan provides for the forfeiture of accrued benefits attributable to service with a participant's employer before the employer was required to contribute to the plan in the event that the employer ceases making contributions to the plan.

H.R.Rep. No. 869, Part II, 96th Cong., 2d Sess. 73 (1980), U.S.Code Cong. & Admin.News 1980, p. 3059. In neither report is this right qualified by reference to any limitations in §§ 203(c)(1)(B) or 204(g). Since, as noted above, such a limitation would have curtailed drastically the usefulness of subsection (a)(3)(E), that omission is suggestive. It is also significant that the provision in subsection (a)(3)(E) was put in (a)(3), which provides for routine cancellations like death and reemployment. Nothing in the legislative history of those other exceptions to the general vesting rules indicates that Congress intended to have §§ 203(c)(1)(B) or 204(g) apply.

*nonforfeitable*[22] right to a given percentage of his *accrued benefit.*[23] The "vesting schedule" specifies the time at which an employee obtains his nonforfeitable right to a particular percentage of his accrued benefit. *It does not provide any formula or schedule for determining the amount of the accrued benefit.* Thus, "vesting" governs when an employee has a *right* to a pension; "accrued benefit" is used in calculating the *amount* of the benefit to which the employee is entitled. The distinction between the two terms was recognized by the Supreme Court in *Nachman, supra:*

> [T]he term "forfeiture" normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights. Each of the examples of a plan provision that is expressly described as not causing a forfeiture listed in § 203(a)(3) ... describes an event—such as death or temporary re-employment—that might otherwise be construed as causing a forfeiture of the entire benefit. It is therefore surely consistent with the statutory definition of "nonforfeitable" to view it as describing the quality of the participant's *right* to a pension rather than a limit on the *amount* he may collect.

446 U.S. at 372–73, 100 S.Ct. at 1731–32 (emphasis added). In its subsequent decision in *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Court reemphasized the difference:

> [T]he statutory definition of "nonforfeitable" assures that an employee's claim to the protected benefit is legally enforceable, *but it does not guarantee a particular amount or a method for calculating the benefit.* As we explained last Term, *"it is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.'"*

*Id.* at 512, 101 S.Ct. at 1900 (emphasis added) (quoting *Nachman, supra,* 446 U.S. at 371, 100 S.Ct. at 1731). Under the ERISA scheme, a reduction in benefits to employees whose right to a pension in some amount remains vested is not a "forfeiture." A reduction in accrued benefits, standing alone, does not affect the right to obtain benefits and thus does not affect vesting. It changes only the amount of benefits a pensioner receives, *not* his vested status. It cannot be construed as an amendment to the vesting schedule.[24]

■ Section 203(c)(1)(B) is specifically limited to *amendments* to the *vesting schedule.* It does not purport to govern all reductions in accrued benefits. Since the reduction in accrued benefits involved in this case does not affect the vested status of any employee, § 203(c)(1)(B) does not require that employees be offered a choice in benefit calculations.

**22.** The statutory definition of "nonforfeitable" is provided in ERISA § 3(19):

> The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. For purposes of this paragraph, *a right to an accrued benefit derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section [203(a)(3)].*

29 U.S.C. § 1002(19) (1982) (emphasis added).

**23.** "The term 'accrued benefit' means—(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing at normal retirement age ...." *Id.* § 1002(23).

**24.** Some of the language in *Fentron* might be construed to imply that cancellation of credits resulting in reduced benefits are forfeitures prohibited by ERISA: *"Unlike the credits of vested employees,* ERISA does not prohibit the cancellation of Past Service Credits of employees not yet vested under a pension plan." 674 F.2d at 1306 (emphasis added). However, *Fentron* is a case where, as other language in the opinion points out, *all* of the employees involved were actually completely *divested.* Without expressing any opinion on the issue, we assume for purposes of this discussion that the *Fentron* court was correct in holding that such *complete divestiture* brought about by implementation of a plan provision is, in effect, an amendment to the vesting schedule. We reject any broader interpretation of the *Fentron* holding.

Unlike § 203(c)(1)(B), § 204(g) is not limited to vesting schedule amendments. It *does* apply to *amendments* which affect only accrued benefits. But § 204(g) does not apply to every reduction in benefits. Congress did *not* provide: "The accrued benefit of a participant under a plan may not be decreased except as prescribed in section 302(c)(8)." Instead, it provided: "The accrued benefit of a participant under a plan may not be decreased *by an amendment of the plan*, other than an amendment prescribed in section [302(c)(8) ]" (emphasis added). The plaintiffs' argument that any reduction in benefits should be considered a plan amendment would require us to ignore the italicized language in the section.

■ That language is not surplusage. The reason for the limitation is apparent, and is entirely consistent with the remainder of the statutory scheme. Congress's chief purpose in enacting ERISA was to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman, supra*, 446 U.S. at 375, 100 S.Ct. at 1733. Plan trustees have fiduciary duties not only to persons like Stewart and Warren, who have retired, but to those who are now paying into the fund and will receive their promised benefits in the future. The trustees' twin obligations—distributing benefits while protecting the fund—must be balanced:

> The trustees of a pension plan have a fiduciary duty to preserve the financial security of a pension fund and to apply the assets of the fund for the benefit of the employees to the greatest extent possible. We recognize that these respective obligations are often conflicting.

*Adams v. New Jersey Brewery Employees' Pension Trust Fund*, 670 F.2d 387, 397 (3d Cir.1982) (footnote omitted). To give trustees the flexibility necessary for efficient operation of pension funds, Congress has recognized and provided for several situations in which plans can reduce or eliminate benefits to participants by implementing preexisting plan provisions.[25] If Congress had drafted § 204(g) the way the plaintiffs would have us construe it, the subsection would have restricted severely the ability of the trustees to protect the fund in routine situations. In its present form, § 204(g) is specifically limited to *actual amendments*, not otherwise approved by ERISA, which would change benefit amounts. As such, it is entirely consistent with the remainder of ERISA.

Our interpretation also is consistent with the apparent interpretations made by the agencies charged with administering ERISA, and with the decisions of other courts which have faced the issue. It does not appear that either the Secretary of Labor (whose approval the plaintiffs claim is *vital* to Congress's statutory scheme) or the Internal Revenue Service (which is charged with approving or disapproving plans for tax purposes) has challenged the Fund's action in this case. Neither the Secretary nor the Commissioner is claiming that §§ 203(c)(1)(B) and 204(g) apply to any of the nonforfeitability exceptions under § 203(a)(3). The Secretary has not indicated that he believes that it is his duty to evaluate and approve benefit reductions made under provisions such as § 2.09 of the plan.

The Internal Revenue Service has not denied favorable tax treatment to plans which include or exercise precontributory service cancellation clauses. The I.R.S. does not treat a benefit as forfeitable merely because an employee's accrued benefit which results from service with an employer before such employer was required to contribute to the plan is forfeitable on account of the cessation of contributions by the employer of the employee.

---

**25.** *See, e.g.,* ERISA §§ 203(a)(3)(A) (death of plan participant); 203(a)(3)(B) (reemployment of plan participant); 204(b)(1)(B)(iv), 204(b)(1)(C), 204(b)(1)(G) (integration of other retirement benefits); *Alessi, supra,* 451 U.S. at 516–17, 101 S.Ct. at 1902–03 (offset of money collected under workers' compensation). *See also* 29 U.S.C. § 1426 (1982) (benefit reductions for insolvent plans).

26 C.F.R. § 1.411(a)–4(b)(5) (1983).[26] Examples provided in the regulations discuss the limitations on cancellations of precontributory service, and they do not suggest that §§ 203(c)(1)(B) and 204(g) are applicable.[27]

The courts have also interpreted the statute in this manner. In *Alessi, supra,* the Supreme Court considered pension plan provisions which permitted the fund in question to reduce benefits to a participant by the amount of workers' compensation received by the participants. Just as in this case, the *effect* of the fund's action in *Alessi* was to reduce benefits to vested participants, so this would have been—under the plaintiffs' theory—an "amendment" to the plan. The participants in *Alessi* were not given the chance to keep their pre-"amendment" benefit amounts, nor was the benefit reduction presented to the Secretary of Labor for his approval. But the unanimous Supreme Court held that the fund's action in reducing the benefits did not violate ERISA. *Alessi,* 451 U.S. at 516–17, 101 S.Ct. at 1902–03.

In *Harm v. Bay Area Pipe Trades Pension Plan Trust Fund,* 701 F.2d 1301 (9th Cir.1983), a pension plan enforced its rule cutting off benefits to a retired worker who took new employment. Under the plaintiffs' theory, this too would be an "amendment" which decreased benefits to an individual whose rights were vested under the plan. Authority to curtail benefits upon reemployment—like authority to cancel precontributory service credits—is found in ERISA § 203(a)(3). Like the plaintiffs in this case and in *Alessi,* the participant in *Harm* was not given the option to take his pre-"amendment" benefits, and the Secretary of Labor did not review the fund's decision. Nevertheless, the court held that the fund's denial of benefits was proper. 701 F.2d at 1305–06.

Other courts have construed ERISA to permit cancellation of precontributory service when necessary to avoid the dumping of unfunded liability, without suggesting that §§ 203(c)(1)(B) and 204(g) were implicated. In *Central Tool, supra,* the district court invalidated the benefit cancellation at issue, but on the ground that the fund had not demonstrated that such cancellation was necessary to avoid the dumping of unfunded liability. The court found "unexceptionable" the goal of "protect[ing] the fund from the dumping of unfunded liability as a result of an employer's termination of participation after past service credits have been granted to its employees." *Central Tool,* 523 F.Supp. at 816. The court concluded:

> It remains for the Court to attempt to harmonize the vested status of plaintiff's employees with achievement of defendants' legitimate objective of preserving the fund from unfunded liability. The controlling guideline for effecting this reconciliation is to validate the provision to the maximum extent possible consistently with the constraint that the provisions not cause a divestment of any vested employee. This objective is best achieved by allowing the forfeiture of past service credit, pursuant to the provisions, for benefit accrual purposes, but

---

**26.** This regulation was promulgated under the original version of 26 U.S.C. § 411(a) (1976), prior to enactment of the 1980 ERISA Amendments which added *id.* § 411(a)(3)(E) and its counterpart, ERISA § 203(a)(3)(E), but it continues without change.

**27.** In 26 C.F.R. § 1.414(f)–1 (1983), an example is given of how a multiemployer plan could properly reduce precontributory service credits without violating ERISA. In the example, the Service would permit cancellation of precontributory service credits for an employee who had 15 years of precontributory service and 15 years of contributory service, if his employer withdrew from the plan. The I.R.S. found that the

plan would not violate ERISA so long as benefits for *contributory* service are not forfeited:

> [I]n order for the plan to meet the [nonforfeitability] requirements ... the plan must provide for [the employee's] accrued benefit after [the employer] ceased to be a member of the plan to be at least ... [the employee's] total accrued benefit *less ... benefit accrued for service prior to [the employer's] membership in the plan.*

*Id.* § 1.414(f)–1(b)(2)(ii) (emphasis added). *The regulation does not indicate that, as an additional requirement the employer must comply with the provisions of ERISA relied upon by the plaintiffs.* This is an interpretation of the statute that is entitled to considerable force.

not for the purpose of determining vested status.

*Id.* at 818 (footnotes omitted).[28]

Similarly, the Ninth Circuit in *Elser, supra,* noting that it "agree[d]" with the holding in *Central Tool,* found the fund's cancellation of credits to be arbitrary and capricious—the fund presented *no* evidence of *any* actuarial reason for its actions—but did *not* apply §§ 203(c)(1)(B) and 204(g) to impose additional procedural requirements. The court, after quoting *Central Tool* on the importance of avoiding unfunded liability, noted that precontributory service could be cancelled to the extent "necessary or reasonable to protect the financial stability of the fund." *Elser,* 684 F.2d at 658.[29]

Finally, the weakness of the plaintiffs' interpretation is demonstrated by its logical consequences. Since the right to cancel precontributory service credits is included in the list of exceptions in § 203(a)(3), the plaintiffs must necessarily maintain that powers granted under that section may only be exercised if §§ 203(c)(1)(B) and 204(g) are complied with.[30] Under the plaintiffs' theory, for example, a pension fund would have the right to cancel benefits paid to a participant with 5 or more years of service when that participant dies, § 203(a)(3)(A)—but *only* if (1) the dead participant (or, perhaps, his estate) is given the right to elect to continue receiving full benefits, *and* (2) the Secretary of Labor finds that the cancellation is necessary to assure the financial soundness of the pension fund. There is no evidence that Congress intended such an unreasonable result.

■ From our review of the provisions of ERISA and the applicable authorities, we conclude that actions which are specifically permitted by ERISA § 203(a)(3), and which are carried out under authority reserved by the pension plan without actual *amendment* of the plan, are not subject to the procedures outlined in §§ 203(c)(1)(B) and 204(g).[31]

IV.

■ Our conclusion does not dispose of this litigation. It has been held that cancel-

---

**28.** *See also Baltimore Rebuilders, Inc. v. NLRB,* 611 F.2d 1372, 1379–80 (4th Cir.1979), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980):

We think the challenged provisions [permitting cancellation of precontributory service] evidence an intention to encourage the voluntary continuation of pension coverage on a unit-wide basis. As such, they serve a legitimate business purpose of the Fund to reasonably limit an unfunded liability....

. . . . .

In all, we think automatic cancellation of the credits when contributions cease is a reasonable plan provision which operates fairly to induce the voluntary continuation of pension coverage.

**29.** The *Elser* court did not discuss the language in the *Fentron* decision suggesting that the two subsections would apply in this situation, *see* note 24 *supra,* but the *Elser* court was fully aware of its earlier decision. Since *Elser* addressed cancellations like those in this case, while *Fentron* involved cancellations that *divested* participants, we believe that our interpretation is fully consistent with that of the Ninth Circuit on this issue. Our interpretation of *Elser* and *Fentron* is also consistent with the Ninth Circuit's decision in *Harm, supra,* involving another § 203(a)(3) exception.

**30.** Perhaps recognizing the absurdity of this position, the plaintiffs avoid suggesting that the other § 203(a)(3) exceptions are also governed by the procedures in §§ 203(c)(1)(B) and 204(g). But they offer no rational basis for treating subsection (a)(3)(E) differently from the other exceptions in subsection (a)(3). To the extent that the plaintiffs argue that a decrease in benefits to vested employees is a plan amendment, we see no reasonable basis for distinguishing them.

**31.** To some extent, the unfunded liability problems that pension funds face have been eased by the 1980 ERISA Amendments, which permit pension funds to recover unfunded liability directly from withdrawing employers. (The present case is not covered by these amendments, since Anchor withdrew in 1979.) It is true that the new provisions make it "significantly less likely that forfeiture provisions ... will be invoked." Brief for Appellants at 46. But these provisions are useful only to the extent that the withdrawing employer has sufficient assets to cover the unfunded liability. If an employer is insolvent—and insolvency is, of course, a common reason for withdrawing from a fund—the pension fund will be in the same position as the Fund in this case. Thus, there will certainly be situations, even under the new provisions, where unfunded liability can be

lations of precontributory service, while permissible, are nevertheless subject to review to ensure that the trustees did not act in an arbitrary and capricious manner in cancelling benefits. *Elser, supra*, 684 F.2d at 658; *Central Tool*, 523 F.Supp. at 816. The plaintiffs argued in the alternative in the district court that the trustees acted arbitrarily and capriciously in cancelling the precontributory service credits of Anchor employees. The district court, which decided the case on the basis of §§ 203(c)(1)(B) and 204(g), did not reach this contention. At oral argument, the Fund's representatives conceded that the case should be remanded to consider whether the Fund's cancellation of credits was arbitrary or capricious.

■ We note, however, that avoiding the dumping of unfunded liability is a permissible goal of multiemployer pension funds. When a fund is obligated to pay out more money than has been paid in, and it is unable to recoup the difference, "[t]hese excess benefits would have to come largely from the stepped-up contributions of current participants." *Harm, supra*, 701 F.2d at 1305. Thus, to the extent that cancellation is necessary to avoid the dumping of substantial unfunded liability, it is presumptively reasonable. On remand, the district court should evaluate the evidence to determine whether there was a reasonable actuarial basis for the action of the trustees.[32]

minimized only through cancellation of precontributory service credits.

**32.** The plaintiffs also argued in the alternative that the cancellation of service credits violated other provisions of the plan itself. They rely on § 7.09 of the plan:

The benefits *to which a Participant is entitled under the terms of this Plan* upon his attainment of Normal Retirement Age are Vested (nonforfeitable), subject, however, to retroactive amendment made within the limitations of Section 411(a)(3)(C) of the Internal Revenue Code and Section 302(c)(8) of ERISA.

(J.A. 193) (emphasis added). The plaintiffs argue that "once the participant has become eligible for a certain amount of benefits, the Trustees cannot unilaterally forfeit *any* of those benefits without violating [the plan's] nonforfeitability provision" (J.A. 301). But cancellations of precontributory service credits upon employer

## V.

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.[33]

*Judgment accordingly.*

withdrawal do not violate ERISA's nonforfeitability provisions, and the plan specifically provides for cancellation of such credits when an employer withdraws. Section 7.09 provides that only benefits to which a participant is "entitled under the terms of [the] plan" are nonforfeitable. Since § 2.09 specifically removes the entitlement of participants to benefits for precontributory service with a withdrawing employer, participants are not "entitled" to those benefits under the plan. There is no violation of the plan's nonforfeitability provision.

**33.** Since we decide that §§ 203(c)(1)(B) and 204(g) do not apply at all to benefit accrual changes made under the procedures outlined in § 203(a)(3), we do not reach the district court's holding that the protections of § 203(c)(1)(B) do not generally apply to persons who retired before January 1, 1976, but that § 204(g) *does* apply to such persons. *Stewart*, 563 F.2d at 777.